[Civ. No. 3722.   Second Appellate District, Division One.—November 14, 1921.]

GEORGE A. MOORE et al., Respondents, v. CALIFOR-NIA–MICHIGAN LAND AND WATER COMPANY (a (Corporation), Appellant.

[1] WATERS AND WATER RIGHTS — OWNERSHIP IN WELL ON LOT OF ANOTHER—EXTENT OF INTEREST—CONSTRUCTION OF DEEDS.—Where the grantors of two lots in a certain tract, who were not shown to have had any title to a third lot, conveyed with such lots eight fifty-fourths of the water in the well on such third lot to the extent of twenty-six thousand gallons each twenty-four hours, and the owner of such third lot thereafter executed a deed conveying to such grantees "the water right described" in the earlier deed, such confirmatory deed did not enlarge the right given to the grantees by the earlier deed, and they acquired only the fractional part of the water in the existing well, and not such part of all the waters underlying such lot.

APPEAL from a judgment of the Superior Court of Los Angeles County.   Grant Jackson, Judge.   Reversed.

The facts are stated in the opinion of the court.

Goodspeed & Pendell for Appellant.

Daniel M. Hunsaker and Hunsaker, Britt & Cosgrove for Respondents.

JAMES, J.—Plaintiffs' action was for equitable relief. They alleged that they were the owners of two certain lots of land and the owners of the right to eight fifty-fourths of the water on and under another lot (lot 8) in the same tract; that the defendant was the owner of other water which had its source on this third lot, and that, under conditions of this ownership, defendant was not permitted to take water to points outside of the tract; that defendant had made with plaintiffs a certain agreement respecting the apportionment of operating charges of a pumping plant used to furnish water to the plaintiffs and the defendant, and had afterward refused to abide by such agreement and had interfered with the plaintiffs in their attempt to make use of water to which they were entitled; that water was

being taken by defendant from the tract to places outside
of it and sold. The prayer of the complaint was for a
decree determining that the plaintiffs were the owners of
eight fifty-fourths of any and all waters in or under lot 8
in the tract of land described and the owners of a propor-
tionate interest in the pumping plant. Further relief asked
for was that defendant be restrained from taking any water
from the lot referred to and selling to any point outside
of the tract, and be further restrained from acting other-
wise than to observe the conditions of its agreement re-
specting the apportionment of charges incurred in the opera-
tion of the pumping plant. The decree of the trial judge
was in accordance with the prayer of the complaint, and
the defendant has appealed.

The facts were established in part by stipulation and in
part by the introduction of evidence oral and documentary.
The parties at the trial first agreed that defendant was, and
had been since 1910, a corporation engaged in the business
of loaning, selling, and leasing real property and in selling,
as a public utility corporation, water for domestic use and
irrigation purposes to the inhabitants of certain territory,
some residing in Chapman's Homestead Tract and some out-
side the limits of said tract; that plaintiffs were, and had
been since January 5, 1910, the owners of lots 3 and 4 of
Chapman Homestead Tract and that the defendant, since
March 1, 1912, had been the owner of all of the remaining
lots in said Homestead Tract, and the owner of whatever
rights Richard B. Chapman, Ruth Chapman, and Louisa
Chapman had by reason of a certain contract dated March
2, 1905. It was further stipulated that the recitals in the
contract of March 2, 1905, were correct as to the facts
therein stated and that both plaintiffs and defendant traced
their record titles to said contract; that the facts stated in
said agreement were true. The contract referred to as that
of date March 2, 1905, and which, under the stipulation of
the parties, determines the origin of the title to the lands
of plaintiffs and defendant and defines certain water rights
and restrictions attending their enjoyment, was made be-
tween three parties, to wit: Richard B. Chapman, Ruth
Chapman, and Louisa Evelyn Chapman, parties of the first
part, Alfred B. Chapman, party of the second part, Cather-
ine C. Chapman, Lettice Chapman, M. L. Wicks, A. A. Rice,

W. P. Cayley, Mary Webster, and Mary G. Criswell, parties of the third part. This agreement first declared that the parties of the third part owned the Chapman Homestead Tract, consisting of thirty-one acres; that Catherine C. Chapman owned all of the tract except lots 1, 2, 3, 4, 5, 12, and 9; that Lettice Chapman owned lots 1, 2, 3, and 4, subject to a contract to sell the same to M. L. Wicks; that Cayley owned lots 5 and 12, and Mary G. Criswell lot 9. It was declared that parties of the first part owned in common certain rights to the water that could be developed in the Chapman Homestead Tract, and the party of the second part owned a certain interest in a reservoir on lot 8 called the "brick reservoir"; further, that there was appurtenant to the Homestead Tract a one-half interest in a well on the land of the parties of the first part, together with rights of way to reach the same. The agreement declared that Catherine and Lettice Chapman (parties of the third part) were desirous of procuring a release of the general right of development and of way on the whole of the Homestead Tract, and that they desired to locate such rights on particular portions of the tract to better advantage, and that Cayley and Criswell were desirous of having such rights released as to their lands; that, therefore, in view of the mutual considerations, the third parties granted to the first parties the exclusive and perpetual right to bore, dig, and construct wells for the purpose of obtaining water upon two rectangular parcels of land forty feet square, one to be located upon lot 2 and the other upon lot 4, and the further right to erect, maintain, and operate pumping plants in connection therewith; also right of way for private road fifteen feet wide extending from each of the two parcels for the purpose of ingress and egress and the perpetual right to take and extract from the wells which might be constructed upon either parcel of land all of the waters that would flow, or might be lifted, therefrom, and to convey such waters to any and all places as the parties of the first part, their heirs or assigns, might desire. By the agreement other necessary incidental rights were provided to be vested in parties of the first part. The parties of the third part, in view of the said considerations, by the agreement released all rights which they had in the well first referred to, which was located on land other than that comprised within the

Chapman Homestead Tract. The agreement further recited that parties of the third part, in order to secure to the parties of the first part the "privileges and servitudes" granted, and to protect the parties of the first and second parts from a diminution of flow of underground waters, agreed as a covenant "running with and for the benefit of said land of said parties of the first part" and as binding on all portions of the Homestead Tract owned by said parties of the third part; that neither they, their heirs nor assigns, nor subsequent occupants of those portions of the Homestead Tract owned by them, would at any time thereafter convey any water which might be obtained from any well or wells on said Homestead Tract to any place outside of said Homestead Tract, or permit any other person or persons or corporations "other than said parties of the first part hereto, or their heirs or assigns," to convey such waters so obtained from wells on said Homestead Tract. The agreement further declared that it was the intention to restrict the use of water developed on the Homestead Tract to the land composing that tract ·by *persons other than parties of the first part,* and that parties of the first part would have the right to take and appropriate any water that should be conveyed from or should flow off from the Homestead Tract from any well or wells located thereon, whether such wells were constructed by the parties of the first part or not. Parties of the first and second parts, by reason of the considerations referred to in the agreement, released to the parties of the third part all rights, privileges, easements, and servitudes held, owned, or possessed by them in or to the land composing the Homestead Tract, except as otherwise provided in said agreement.

It will be noted, first, that the agreement declared the ownership of lots 3 and 4 to be in Lettice Chapman subject to the contract to sell the same to M. L. Wicks. It may be added that the agreement of 1905 imposed an easement upon lot 4 to the extent of giving to the first parties the right to place a well on a portion thereof forty feet square, and this condition remains to affect the title held by plaintiffs. The stipulations of the parties, made as to the evidence, brought all of the terms of that contract before the court. The stipulation that plaintiffs were the owners of the two lots 3 and 4 should be taken as modified by such

conditions as the contract referred to shows. Under the facts recited in that agreement, Catherine C. Chapman was the owner of lot 8 in said tract. A deed was introduced in evidence dated May 31, 1905, acknowledged on the 1st of June, 1905, recorded November 14, 1905. This deed was made on the part of Lettice C. Rawlinson, *née* Chapman, M. L. Wicks, and Douglas Rawlinson, as grantors, and August C. Fimmen and Freda Fimmen, grantees. This deed purported to convey title to lots 3 and 4 of the Chapman Homestead Tract and contained the following words: "together with eight fifty-fourths of the water in the well on lot eight of this tract to the extent of thirteen thousand gallons each twenty-four hours subject to a reasonable charge for pumping said water. This limit is raised to twenty-six thousand gallons each 24 hours." Up to this point no interest is disclosed in the grantors mentioned in that deed to any part of lot 8 or any well or water thereon. As before mentioned, title to this lot was shown by the agreement first referred to to have been in Catherine C. Chapman, who will be presumed to have continued as such owner until a change of ownership is shown. On the 14th of March, 1907, it not appearing that Catherine Chapman had divested herself of ownership of lot 8, she executed an instrument of conveyance in favor of the two Fimmens, husband and wife, which, after the usual declarations as to consideration, etc., purported to convey to the grantees "the water right described in deed from Lettice C. Rawlinson, *née* Chapman, of date June, 1905, for Lots 3 and 4 of the C. L. Chapman Homestead Tract as per map recorded . . . , said deed being made to these grantees subject to mortgage lien," etc. By deed dated January 5, 1910, the Fimmens transferred their interest in lots 3 and 4 to the plaintiffs. The deed was in usual form, and contained this clause: "together with eight fifty-fourths *of the water on Lot eight* of this tract."

[1] It will have been already noted that the deed which conveyed title to the Fimmens to lots 3 and 4 pretended also to convey "eight fifty-fourths of the water in *the well* on Lot 8 of this tract to the extent of . . . 26,000 gallons each twenty-four hours." When Catherine C. Chapman confirmed to the Fimmens this water right by her deed of March 14, 1907, she referred to it as being "the water

right described in deed from Lettice C. Rawlinson, *née* Chapman, of date June, 1905, for lots 3 and 4 of the C. L. Chapman Homestead Track.'' To the terms of these conveyances we must look for the entire measure of the right acquired by the plaintiffs to any water to be taken from lot 8. Catherine Chapman, by her instrument of conveyance, confirmed to the Fimmens nothing more than the right described in the deed which they had received, which was a right to eight fifty-fourths of the water in an existing well. We attach no importance to the claim that Catherine Chapman's deed was insufficient because it referred to the conveyance to the Fimmens of lots 3 and 4, and the accompanying water right, as being evidenced by a deed ''of date June, 1905.'' This claim is made because it appeared that that deed was in reality dated May 31, 1905. It was acknowledged on the 1st of June, 1905, and was made by the parties described in the Catherine Chapman conveyance, and was the only deed shown to have theretofore been made transferring title to the designated parties to lots 3 and 4 of the Homestead Tract. It was sufficiently definite in its reference to the right intended to be conveyed. However, it did not in anywise enlarge the right given to the Fimmens and we are unable to find anything in the record showing that the Fimmens (plaintiffs' grantors) ever acquired any greater interest than that indicated by the deed above referred to. To be sure, in the deed which they gave to the plaintiffs they described the water right as being ''eight fifty-fourths of *the water on Lot 8* of this tract,'' but that conveyance could operate to transfer nothing more than the Fimmens already possessed. Nor does the fact that a mortgage, given to Catherine Chapman by the plaintiffs herein, which was in lieu of a mortgage executed by the Fimmens, described the water right in the larger terms extend the right. The plaintiffs may be said then to have shown a clear title by chain of conveyances to a right to eight fifty-fourths of the water in the well which was located on lot 8 in 1905, such right to be limited to the use of a maximum quantity of twenty-six thousand gallons each twenty-four hours. This is quite a different thing from the possession of a right to that proportion of all the waters underlying lot 8, which the trial judge determined was the right to which plaintiffs were entitled.

The trial judge also determined that plaintiffs were the owners of a proportionate interest in the pumping plant and machinery used in connection therewith for the purpose of raising water from the well on lot 8. It appeared in testimony that when the Fimmens began to occupy lots 3 and 4 in 1905 there was at the well on lot 8 a pump and a gasoline engine, together with the necessary connections for operating the pump; that the Fimmens made use of the water in the well for their domestic purposes and furnished gasoline and oil with which to operate the engine and pump when required. This practice continued during the whole of the time they were on the property, and the pumping plant there existed when the plaintiffs came into possession of lots 3 and 4. As to who originally paid for the engine and pump does not appear. It does appear, however, that the apparatus was made use of for the mutual benefit of the parties interested in the well, including plaintiffs' predecessors, and that the right to so use the engine and pump was conceded to be in the owners of lots 3 and 4, to the extent, at least, that such use was necessary in order to entitle them to secure the water conveyed to them. The evidence showed that in 1917 the plaintiffs here, being then in possession of lots 3 and 4, and having continued to make use of some of the water from the well on lot 8, made an agreement with defendant's superintendent which not only recognized to the plaintiffs a right in the well and the pumping outfit, but proceeded to fix definite terms with respect to the apportioning of further operating charges. The deposition of defendant's superintendent recited that the manager of the defendant corporation requested him to secure the consent of plaintiff George Moore to have substituted an electric motor in place of the gasoline engine to be used in pumping the water from the well; that such consent was obtained, on certain' specified conditions, all of which defendant's manager approved; that the gasoline engine was taken away and sold by the defendant and the electric motor installed, but that defendant's manager failed and refused to furnish a statement of operating charges to plaintiff George Moore, as it had been agreed should be done. Defendant offered no testimony to contradict the statement of its superintendent, and we think that this testimony *prima facie* established a valid contract against

the defendant corporation. Plaintiffs possessed the undoubted right to use the pumping plant, as it had existed on the well on lot 8 for so many years, and a consent to change from the gasoline engine to the electric motor was sufficient consideration for the making of the agreement as the record shows its terms. The matter of apportioning the operating charges, repair, or replacement bills seems never to have been settled prior to the date of this last agreement, and, as it was not a subject determined by any term of the water right conveyance, necessarily it was left an open question, dependent upon agreements to be later arrived at. The evidence is sufficient to sustain the court's finding that the agreement was made as alleged respecting the removal of the gasoline engine and the substitution of the electric motor therefor, and as to the apportionment between the parties of the operating charge which might thereafter be incurred. The water right itself under the evidence cannot be enlarged from that proportion and quantity fixed in the early conveyance to the Fimmens; in other words, the interest is an interest in the water in the particular well and not the water underlying lot 8. Furthermore, the evidence does not sustain the judgment in so far as it is determined that defendant has not the right to sell water which it may be entitled to take from the well on lot 8, outside the Chapman Homestead tract. The contract of March 2, 1905, made between the several Chapmans and others as principals, in its restrictive feature affecting the taking of water beyond the limits of that tract, expressed a condition in favor of the owners of the outside property and not the owners of the Homestead tract. The defendant here has succeeded to all of the rights of the parties in whose interest that condition was made, and hence is in a position to waive the benefit of it. In no event that occurs to our mind may the owners of any of the lots in the Homestead tract, because of that ownership alone, insist that water originating thereon shall not be sold and delivered outside the confines of the tract.

The judgment is reversed.

Conrey, P. J., and Shaw, J., concurred.